**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. 23-cr-00070-JB** |
| | * | |
| **CRAIG D. PERCIAVALLE** | * | |
| **JOSEPH A. RUNKEL** | * | |
| **WILLIAM O. ADAMS** | * | |

**UNITED STATES' RESPONSE IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS THE INDICTMENT**

## TABLE OF CONTENTS

I.   BACKGROUND .................................................................................... 1

II.  LEGAL STANDARD ............................................................................ 4

III. DISCUSSION ....................................................................................... 5

    A.   The Indictment Sufficiently Alleges a Scheme to Defraud
        Austal Limited Shareholders and the Investing Public of
        Money or Property ...................................................................... 7

        1.   The Defendants Schemed to Deprive Purchasers of Austal
            Limited Shares of Their Money or Property ........................................ 7

        2.   The Government Is Not Relying on a "Right-to-Control"
            Theory ................................................................................... 9

        3.   The Scheme to Defraud Austal Limited's Shareholders and
            the Investing Public of Their Money or Property
            Alleged in the Indictment is Unaffected by *Ciminelli* ........................12

        4.   The Money or Property of Austal Limited's Shareholders
            and the Investing Public Was Not an Incidental
            Byproduct of the Defendants' Scheme to Defraud .............................16

    B.   The Indictment Sufficiently Alleges a Scheme to Defraud Austal
        Limited's Shareholders and the Investing Public.....................................17

        1.   The Indictment Properly Alleges a Scheme to Defraud
            and the Defendants' Intent to Defraud .................................................18

        2.   The Defendants' Fraudulent Misrepresentations Went to
            the Heart of the Bargain: the Financial Performance of
            Austal Limited .......................................................................19

        3.   The Indictment Alleges a Convergent Theory of Wire Fraud:
            The Defendants Intended for Purchasers of Austal Limited Stock to
            Be Both Deceived and Deprived of Their Money or Property...........21

IV.  CONCLUSION.......................................................................................23

# TABLE OF AUTHORITIES

**Cases:**

*Baker v. United States*,
No. A-13-CR-346-1-LY, 2022 WL 21805928 (W.D. Tex. May 17, 2022) ........................ 13, 14

*Baker v. United States*,
   No. 1:13-CR-346-DAE, 2023 WL 8234212, (W.D. Tex. Nov. 27, 2023) ........................13, 14

*Carpenter v. United States*,
   484 U.S. 19 (1987).................................................................................................. 11

*Ciminelli v. United States*,
   598 U.S. 306 (2023)....................................................................................... 1, 6, 9, 10, 11

*Kelly v. United States*,
   590 U.S. 391 (2020)........................................................................................... 7, 10

*McNally v. United States*,
   483 U.S. 350 (1987)........................................................................................... 7, 11

*United States v. Baker*,
   923 F.3d 390 (5th Cir. 2019) ................................................................................ 22

*United States v. Bell*,
   112 F.4th 1318 (11th Cir. 2024) .......................................................................... 20

*United States v. Blumeyer*,
   114 F.3d 758 (8th Cir. 1997) ............................................................................... 21

*United States v. Bobo*
   344 F.3d 1076 (11th Cir. 2003) ........................................................................... 19

*United States v. Bradley,*
   644 F.3d 1213 (11th Cir. 2011) ..........................................................................18, 19

*United States v. Cadillac Overall Supply Co.*,
    568 F.2d 1078 (5th Cir. 1978) ................................................................... 5

*United States v. Christopher*,
    142 F.3d 46 (1st Cir. 1998) ...................................................................... 21

*United States v. Constantinescu*,
    No. 4:22-CR-00612, 2024 WL 1221579 (S.D. Tex. Mar. 30, 2024) ................................ 15, 16

*United States v. Critzer*,
    951 F.2d 306 (11th Cir. 1992) ..................................................................... 4

*United States v. Gold*,
    743 F.2d 800 (11th Cir. 1984) ..................................................................... 5

*United States v. Greenberg*,
    835 F.3d 295 (2d Cir. 2016) ...................................................................... 21

*United States v. Hedaithy*,
    392 F.3d 580 (3d Cir. 2004) ...................................................................... 22

*United States v. Jesenik*,
    No. 3:20-cr-228-SI, 2023 WL 3455638 (D. Or. May 15, 2023) ................................... 9, 15

*United States v. Johnson*,
    981 F.3d 1171 (11th Cir. 2020) .................................................................... 5

*United States v. Jordan*,
    582 F.3d 1239 (11th Cir. 2009) .................................................................... 4

*United States v. Lew*,
    875 F.2d 219 (9th Cir. 1989) ..................................................................... 21

*United States v. McMillan*,
    600 F.3d 434 (5th Cir. 2010) ..................................................................... 21

*United States v. Milton*,
No. 21-CR-478-ER, 2023 WL 5609098 (S.D.N.Y. Aug. 30, 2023) ....................................... 14

*United States v. Nordlicht*,
No. 16-CR-00640-BMC, 2023 WL 4490615 (E.D.N.Y. July 12, 2023) .......................... 11, 12

*United States v. Pendergraft*,
297 F.3d 1198 (11th Cir. 2002) ............................................................................. 18

*United States v. Percoco*,
13 F.4th 158 (2d. Cir. 2021) ................................................................................. 10

*United States v. Porat*,
76 F.4th 213 (3d Cir. 2023) .................................................................................. 13

*United States v. Salman*,
378 F.3d 1266 (11th Cir. 2004) ............................................................................... 5

*United States v. Schessel*,
2:22-cr-00374-ES (D.N.J. Apr. 23, 2024) ...................................................................7

*United States v. Seidling*,
737 F.3d 1155 (7th Cir. 2013) ............................................................................. 21

*United States v. Sharpe*,
438 F.3d 1257 (11th Cir. 2006) ..................................................................... 4, 5, 7

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007) ............................................................................. 20, 21

*United States v. Starr*,
816 F.2d 94 (2d Cir. 1987) ................................................................................... 21

*United States v. Steele*,
147 F.3d 1316 (11th Cir. 1998) .............................................................................. 5

*United States v. Steele*,
    178 F.3d 1230 (11th Cir. 1999) ................................................................. 5

*United States v. Takhalov*
    827 F.3d 1307(11th Cir.), as revised (Oct. 3, 2016)......................18, 19, 20,

*United States v. Torkington*,
    812 F.2d 1347 (11th Cir. 1987) ............................................................ 4, 5

*United States v. Tournant*,
    No. 22-CR-276-LTS, 2023 WL 8649893 (S.D.N.Y. Dec. 13, 2023) ...................... 14

*United States v. Tuzman*,
    Nos. 21-2229 (L), 21-2379 (CON), 2024 WL 1173044 (2d Cir. Mar. 19, 2024).............. 12, 13

*United States v. Walker*,
    490 F.3d 1282 (11th Cir. 2007) ................................................................. 5

**Statutes:**

18 U.S.C. § 2 ...................................................................................................1

18 U.S.C. § 1343 ....................................................................... 1, 5, 6, 10, 11, 18

18 U.S.C. § 1347 ........................................................................................... 19

18 U.S.C. § 1348 ........................................................................................... 15

18 U.S.C. § 1349 .................................................................. 1, 5, 6, 10, 11, 15, 18

**Rules:**

Fed. R. Crim. P. 7 ................................................................................ 4, 5, 8, 16, 18

Fed. R. Crim. P. 12(b)(3) ........................................................................................ 4, 5

The United States of America, by and through Sean P. Costello, the United States Attorney for the Southern District of Alabama, and Glenn S. Leon, Chief of the Fraud Section, Criminal Division, Department of Justice, files this response in opposition to the defendants' motion to dismiss the Indictment. [Doc. No. 129] The defendants' motion should be denied as it mischaracterizes the Indictment, which properly alleges a scheme to defraud Austal Limited investors of their money or property, which are traditional property rights protected by the federal fraud statutes.  As such, the defendants' heavy reliance on the Supreme Court's opinion in *Ciminelli v. United States*, 598 U.S. 306 (2023), is misplaced, because this case does not concern a "right to control" theory of fraud, the sole theory at issue in *Ciminelli*.

## I.    BACKGROUND

On March 30, 2023, a federal grand jury in the Southern District of Alabama returned an Indictment against defendants Craig D. Perciavalle, Joseph A. Runkel, and William O. Adams (hereinafter "Perciavalle," "Runkel," and "Adams" or, collectively, "the defendants"), charging them with one count of conspiracy to commit wire fraud and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1349, five counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 2, and two counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. §§ 1343, 2.  [Doc. No. 1]

The Indictment alleges that, from in or around 2013 through in or around 2016, while serving as executives at Austal USA, a contractor for the United States Navy, the defendants agreed and schemed to make and cause others to make false and misleading statements about Austal USA's financial performance on one of its Navy shipbuilding programs (the littoral combat ship or LCS program), and about Austal USA's overall financial condition, in order to defraud Austal Limited's shareholders and the investing public.   [*Id.* at ¶ 12.]   The defendants did this by intentionally providing false and fraudulent financial information to Austal USA's Board of

Directors, Austal USA's independent financial statement auditors, and Austal Limited for dissemination to Austal Limited's shareholders and the investing public. [*Id.* at ¶ 13.] The defendants engaged in the scheme to defraud to mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition in order to maintain and increase the share price of Austal Limited's stock (through the purchase of shares by shareholders and the investing public at artificially inflated prices) and unjustly enrich the defendants and others through the continued receipt of compensation, stock, and other benefits. [*Id.* at ¶ 14.]

Austal Limited was a publicly-traded company that listed its shares on the Australian Securities Exchange, or ASX, but also offered American Depository Receipts ("ADRs") for purchase in the over-the-counter market in the United States. [*Id.* at ¶ 2.] The ADRs were the equivalent of ten ordinary shares of Austal Limited traded on the ASX. [*Id.*]

The defendants were all involved in aspects of the financial reporting of Austal USA, including preparing and approving certain financial metrics used by Austal USA and meeting with Austal USA's independent financial statement auditors. [*Id.* at ¶¶ 3-7.] One of the financial reporting metrics all the defendants prepared and/or approved was known as an "estimate at completion," or EAC, which was used to calculate the profitability of each vessel Austal USA was building. [*Id.* at ¶ 6.] In order to report accurate financial results, Austal USA needed to provide management's best estimate for the EAC. [*Id.*]

By in or around mid- to late 2013, the defendants and others knew that there were millions of dollars in additional material costs on multiple LCS vessels. [*Id.* at ¶ 16.] Instead of reporting the accurate material costs, the defendants directed Austal USA employees to improperly report suppressed and fictitious material EAC numbers by using a "program challenge," which was a fraudulent plug number in Austal USA's financial records to reduce the material EACs. [*Id.* at ¶ 17.] Throughout the scheme in 2014 and 2015, the LCS material costs continued to grow,

meaning the program challenge also continued to grow to prevent the rising costs from negatively impacting Austal USA's reported financials.  [*Id.* at ¶ 18.]

    Austal USA's financial reporting, which included the fictitious EACs, was transmitted to Austal Limited and used by Austal Limited to report information about its financial performance to its shareholders and other parties.  [*Id.* at ¶ 8.]  Austal Limited used this information in reports and announcements to the investing public and Austal Limited's shareholders and other parties, including in annual and semi-annual reports that contained financial statements that were announced as a "true and fair view" of Austal Limited's financial position.  [*Id.* at ¶ 9.]  The defendants knew that Austal USA's financial statements were used to prepare Austal Limited's publicly reported financial statements that shareholders and the investing public relied upon.  [*Id.* at ¶ 21.]  Perciavalle also presented financial and other information directly to shareholders.  [*Id.* at ¶ 9.]  Through their use of the program challenges, the defendants provided and caused to be provided false and misleading information about Austal USA's performance on the LCS program to Austal Limited's shareholders and the investing public.  [*Id.* at ¶ 20.]  And the defendants did so in order to maintain and increase the share price of Austal Limited, leading to their continued receipt of compensation, stock, and other benefits.  [*Id.* at ¶ 14.]

    Eventually, the cost growth on the LCS program was revealed to shareholders and the investing public.  On or about December 10, 2015, Austal Limited released a "US Shipbuilding Progress Update" to investors, revealing the previously undisclosed performance issues on the program.  [*Id.* at ¶ 31.]  As a result of this announcement, the share price of Austal Limited's stock was significantly negatively impacted.  [*Id.*]  Then, on or about July 4, 2016, Austal Limited reported a "US$115 million . . . one off write back of work in progress" due to the increased costs of construction of the LCS ships and the fact that too much revenue and profit had been attributed to work already completed.  [*Id.* at ¶ 32.]  Again, as a result of this announcement,

the share price of Austal Limited's stock was significantly negatively impacted.   [*Id.*]

The purpose of the above-described scheme was to defraud shareholders and the investing public, but it also affected financial institutions, including Bank 1 and Bank 2.   [*Id.* at ¶ 34.]   Bank 1 and Bank 2 received Austal USA's and Austal Limited's false financial statements for fiscal years 2014 and 2015 prior to entering into a syndicated facility agreement for approximately $105 million to finance construction at Austal USA's shipyard in Mobile, Alabama, among other purposes.   [*Id.* at ¶¶ 34, 36-37.]

## II.   LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b) governs motions to dismiss an indictment. While an indictment may be dismissed where there is an infirmity of law in the prosecution, a court may not dismiss an indictment on a "determination of facts that should have been developed at trial."   *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."   Fed. R. Crim. P. 7(c)(1).   "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes."   *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (emphasis in original); *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("The sufficiency of a criminal indictment is determined from its face.").

"In determining whether an indictment is sufficient, [courts] read it as a whole and give it a 'common sense construction.'"   *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009) (quoting *United States v. Gold*, 743 F.2d 800, 812 (11th Cir. 1984)).   "An indictment is sufficient 'if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.'"

4

*United States v. Steele*, 178 F.3d 1230, 1233–34 (11th Cir. 1999) (quoting *United States v. Steele*, 147 F.3d 1316, 1320 (11th Cir. 1998)). "[I]t is generally enough for an indictment to track statutory language," as long as the indictment "set[s] forth all the elements necessary to constitute the offense intended to be punished," *United States v. Johnson*, 981 F.3d 1171, 1179 (11th Cir. 2020), and "also provides a statement of facts and circumstances that give notice of the offense to the accused," *United States v. Walker*, 490 F.3d 1282, 1296 (11th Cir. 2007).

In evaluating a motion to dismiss, the Court must take the allegations of the indictment as true. *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1082 (5th Cir. 1978). Indeed, Rule 12(b)(3) states that a party may raise by pretrial motion only matters "that the trial court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3); *see also United States v. Salman*, 378 F.3d 1266, 1268 (11th Cir. 2004) (noting that there "is no summary judgment procedure in criminal cases" and that the Federal Rules of Criminal Procedure do not provide "for a pretrial determination of sufficiency of the evidence" (internal quotation marks omitted)). "It is well-settled that 'a court may not dismiss an indictment ... on a determination of facts that should have been developed at trial.'" *Sharpe*, 438 F.3d at 1263 (quoting *Torkington*, 812 F.2d at 1354).

## III.   DISCUSSION

The Indictment alleges an accounting fraud conspiracy and scheme to defraud that had as an object victim-investors' money. In alleging that scheme, the Indictment more than satisfies the pleading requirements of Fed. R. Crim. P. 7, which is all that is required at this stage. The Indictment tracks the statutory language, provides dates and times of the offense, and alleges facts which, if proven, would establish that the defendants executed a wire fraud conspiracy and scheme in violation of 18 U.S.C. §§ 1343 and 1349.

Counts One through Eight track the respective statutory language, including alleging that the defendants committed wire fraud and wire fraud affecting a financial institution by knowingly

and with the intent to defraud devising a scheme to defraud to obtain money and property by means of materially false and fraudulent pretenses, representation, and promises.  *Compare* Dkt. 1, Indictment Count 1, ¶ 40 *with* 18 U.S.C. § 1349; c*ompare* Dkt. 1, Indictment Counts 2 – 6, ¶ 45 *with* 18 U.S.C. § 1343; c*ompare* Dkt. 1, Indictment Counts 7 – 8, ¶ 51 *with* 18 U.S.C. § 1343. Moreover, the Indictment details the nature of the fraud and the manner and means through which the defendants carried it out.  *See* Dkt. 1, Indictment ¶¶ 15 – 38, 43 (incorporating allegations by reference).

The defendants argue that the Indictment must be dismissed for two reasons: (1) the Indictment impermissibly alleges a scheme that had neither money nor property as its object and (2) the Indictment fails to allege a scheme to defraud, only a scheme to deceive.   Both arguments ignore the plain language of the Indictment and mischaracterize its allegations and thus are without merit.

The defendants' first argument fails because the Indictment properly alleges a scheme with money and property as its object.   Nowhere in the Indictment is a "right to control" theory of fraud alleged, and the Government is not proceeding on a right to control theory of fraud.   In *Ciminelli,* the Supreme Court rejected the "right to control" theory of wire fraud, which provided that the term "property" in the wire fraud statute includes the intangible "right to control the use of one's assets," which can be harmed if a defendant deprives a purported victim of "potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Ciminelli*, 598 U.S. at 311-12.   The Indictment in this case does not allege that the defendants impeded someone's right to control the use of their assets, and instead alleges a scheme to trick investors into parting with their money to purchase shares of Austal Limited.

The defendants' second argument fails because the Indictment expressly alleges a scheme to defraud and that the defendants had an intent to defraud, which is all that is the required at this

stage.   The cases cited by the defendants stand for the proposition that "intent to defraud" requires both an intent to deceive and defraud, a proposition that the Government does not dispute.   But these cases do not impose a pleading standard for wire fraud cases beyond alleging a scheme to defraud and intent to defraud, and thus are not applicable at the motion to dismiss stage.

Furthermore, as set forth below, the defendants' arguments would require the Court to evaluate the merits of the United States' case, which is not permitted at this stage.   *See Sharpe*, 438 F.3d at 1263.

### A.    The Indictment Sufficiently Alleges a Scheme to Defraud Austal Limited Shareholders and the Investing Public of Money or Property

The United States agrees with the defendants that the wire fraud statute prohibits only those schemes which have money or property as their object.   *See McNally v. United States*, 483 U.S. 350, 360 (1987); *Kelly v. United States*, 590 U.S. 391, 398 (2020).   The wire fraud conspiracy and scheme alleged in the Indictment adequately alleges precisely such a scheme.

### 1.    The Defendants Schemed to Deprive Purchasers of Austal Limited Shares of Their Money or Property

Contrary to the defendants' assertions, the Indictment explicitly alleges that the defendants engaged in the fraud scheme to obtain money and property.   [Doc. No 1, ¶¶ 40, 45, 51.]   The first purpose of the scheme was to "mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition and the performance of the LCS program in order to . . . *maintain and increase the share price of Austal Limited's stock*."   [*Id.* at ¶ 14. (emphasis added)] In order to maintain and increase the share price, investors must either buy or hold their stock, meaning they will be parting with their money or property.   *See, e.g., United States v. Schessel*, 2:22-cr-00374-ES, at 3 (D.N.J. Apr. 23, 2024) (ECF No. 228) ("A scheme to increase the stock price necessarily involves obtaining money from investors by inducing them to buy or hold [the] stock.").

Although not necessary under Rule 7's pleading requirements, the Indictment's "money and property" theory of fraud is supported by specific and detailed allegations of how the Defendant's scheme to defraud was aimed at increasing Austal Limited's stock price at the expense of victim-investors who purchased the stock at artificially inflated prices. Specifically, the Indictment alleges that:

- "Austal Limited was a publicly-traded company that listed its shares on the Australian Securities Exchange (ASX). Austal Limited also offered American Depositary Receipts *for purchase* in the over-the-counter market in the United States. Each American Depositary Receipt was equivalent to ten ordinary shares of Austal Limited traded on the ASX." [Doc No. 1 at ¶ 2, emphasis added.]

- "Austal Limited published and released to its shareholders, the investing public, and financial institutions various reports and announcements concerning its business operations, including the financial performance of Austal Limited, Austal USA, and the LCS program." [*Id.* at ¶ 9.]

- "PERCIAVALLE, RUNKEL, ADAMS, and others agreed and schemed to make and cause others to make false and misleading statements about Austal USA's financial performance on the LCS program and Austal USA's overall financial condition to defraud Austal Limited's shareholders and the investing public." [*Id.* at ¶ 12.]

- "The purpose of the scheme to defraud was for PERCIAVALLE, RUNKEL, ADAMS, and others to mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition and the performance of the LCS program in order to (a) maintain and increase the share price of Austal Limited's stock; and (b) unjustly enrich PERCIAVALLE, RUNKEL, ADAMS, and others through the continued receipt of compensation, stock, and other benefits." [*Id.* at ¶ 14.]

- "Through their actions, PERCIAVALLE, RUNKEL, and ADAMS improperly provided and caused to be provided false and misleading information about Austal USA's performance on the LCS program, including rising non-labor and labor costs in the program, to Austal Limited's shareholders, the investing public, Accounting Firm 1, and members of the Austal USA Board." [*Id.* at ¶ 20.]

- "One of the means used by PERCIAVALLE, RUNKEL, ADAMS, and others to conceal the negative performance issues and cost growth on the LCS program was to mislead and deceive Accounting Firm 1 during its audits and reviews of Austal USA's financial statements, which PERCIAVALLE, RUNKEL, ADAMS, and others knew were used to prepare Austal Limited's financial statements and other documents on which shareholders and the investing public relied." [*Id.* at ¶ 21.]

- "By concealing negative information about Austal USA's performance and the extent of

the cost growth on the LCS program from members of the Austal USA Board and Accounting Firm 1, PERCIAVALLE, RUNKEL, ADAMS, and others knowingly and intentionally caused Austal Limited to communicate false and misleading information to Austal Limited's shareholders and to the investing public in Austal Limited's required annual and semi-annual financial reporting."   [*Id.* at ¶ 28.]

- The Indictment contains allegations about the effect on the share price when the true performance on the contracts and EACs was revealed: "As a result of this announcement the share price of Austal Limited's stock was significantly negatively impacted."   [*Id.* at ¶¶ 31–32.]

In short, the defendants are not charged with wire fraud for interfering with the investors' right to control their assets by depriving them of accurate information, but rather, are charged with wire fraud for providing false information about Austal USA's financial performance in order to induce shareholders to part with their *money or property*.   This is a classic fraud scheme that falls well within standard wire fraud prosecutions, where a victim parts with money based on false and misleading statements.   *See United States v. Jesenik*, No. 3:20-cr-228-SI, 2023 WL 3455638, at *2 (D. Or. May 15, 2023) (denying mistrial motion during jury deliberations on wire fraud charges, noting "*Ciminelli* did not involve a victim parting with money based on material misrepresentations or half-truths made with an intent to defraud, which is a classic and well-recognized scheme to deprive a person of a traditional property interest, namely money.").

### 2.   The Government Is Not Relying on a "Right-to-Control" Theory

The Government is not pursuing a "right to control" theory, which was the basis of the *Ciminelli* case.   A close review of the *Ciminelli* indictment and litigation demonstrates why it is not relevant to the present case.

The prosecutions in *Ciminelli* centered on New York's "Buffalo Billion" development initiative, through which Fort Schuyler Management Corporation "aimed to invest $1 billion in development projects in upstate New York."   598 U.S. at 309.   Several people conspired to "tailor Fort Schuyler's bid process to smooth the way for" a particular contractor "to receive major Buffalo Billion contracts," crafting criteria specifically designed to favor that contractor; their

9

conduct thereby "effectively guaranteed" the contractor "preferred developer" status.    *Id.* at 310. A grand jury returned an indictment charging the conspirators with, among other things, wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.    *Id.*    The indictment in *Ciminelli* explicitly referenced the "right to control" theory and did not allege a scheme to obtain money or property, alleging a scheme to "defraud Fort Schuyler of its right to control its assets, and thereby exposed Fort Shuyler to risk of economic harm."

"Throughout the grand jury proceedings, trial, and appeal, the Government relied on the Second Circuit's 'right to control' theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions."    *Id.*; *see also id.* at 310 n.1 (clarifying that the Government and the district court did not rely on a theory "that the Buffalo Billion contracts were the property at issue").    The right to control theory was the "sole[]" basis for the indictment and the Government's trial strategy, and it was reflected in a jury instruction expressly directing "that the term 'property' in § 1343 'includes intangible interests such as the right to control the use of one's assets.'"    *Id.* at 311.    On appeal, the Government again "relied solely on the right-to-control theory," and the Second Circuit affirmed on that basis, "holding that, by 'rigging the [requests-for-proposals] to favor their companies, defendants deprived Fort Schuyler of potentially valuable economic information.'"    *Id.* (quoting *United States v. Percoco*, 13 F.4th 158, 171 (2d. Cir. 2021)).

The Supreme Court reversed, explaining that, under *Kelly v. United States*, 590 U.S. 391 (2020), "[t]he right-to-control theory cannot be squared with the text of the federal [mail and wire] fraud statutes, which are 'limited in scope to the protection of property rights,'" because "[t]he so-called 'right to control' is not an interest that had 'long been recognized as property' when the wire

fraud statute was enacted." *Id*. at 314 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987), and *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).

Throughout its opinion, the Court emphasized the absence of support for the "right-to-control" theory it rejected. *Id*. at 313–315 (internal quotation marks omitted); *see also id*. at 314 n.4 ("[T]he right to information necessary to make informed economic decisions, while perhaps useful for protecting and making use of one's property, has not itself traditionally been recognized as a property interest."). At the same time, the Court was careful to go no further, declining to address the merits of any alternative theory of wire fraud the Government could have presented. *Id.* at 316–317; *see also id.* at 317–318 (Alito, J., concurring) (understanding the Court not to be addressing "the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts").

The difference between the charging language and the approach in *Ciminelli* and the Indictment clearly demonstrates why *Ciminelli* is not implicated here. The indictment in *Ciminelli* did not allege a scheme to obtain money or property; it explicitly alleged a scheme to "defraud Fort Schuyler of *its right to control its assets*." In stark contrast, Counts One through Eight of the Indictment alleges a scheme and artifice to "obtain money and property by means of materially false and fraudulent pretenses, representations, and promises," in violation of 18 U.S.C. §§ 1349 and 1343. [*Id.* at ¶¶ 40, 45, 51.]

The defendants claim that *United States v. Nordlicht*, No. 16-CR-00640-BMC, 2023 WL 4490615, at *5–6 (E.D.N.Y. July 12, 2023) demonstrates *Ciminelli*'s "import and . . . relevance to this case," but it does not.[1] [Doc. No. 129 at 16.] In *Nordlicht*, the court granted a motion for acquittal under Fed. R. Crim. P. 29 because the government had not presented *evidence at trial*

---

[1] The United States notes that the government filed a Notice of Appeal of the *Nordlicht* decision on August 16, 2024. Dkt. 1059.

that the defendants sought to obtain money or property.   2023 WL 4490615, at *5–6.   As such, *Nordlicht* has little relevance to this Court's determination of whether the Indictment adequately alleges a scheme to defraud investors of money or property.   This is even more apparent because the facts of *Nordlicht* have almost nothing in common with the scheme alleged in this case:   In *Nordlicht*, the defendants misled the victims in order induce the victims to tender their bonds so that they could be paid out *at full value*.   *Id.* at *4.   Thus, the court held that "no reasonable jury could find beyond a reasonable doubt that [defendants] intended to defraud bondholders of the proceeds of the Renaissance sale except under a 'right-to-control' theory."   *Id.* at *5.   These facts are vastly different from the scheme alleged in this Indictment, whereby the defendants misled Austal Limited's shareholders and the investing public in order to induce them to buy Austal Limited stock at artificially inflated prices.

### 3.   The Scheme to Defraud Austal Limited's Shareholders and the Investing Public of Their Money or Property Alleged in the Indictment is Unaffected by *Ciminelli*

Since the *Ciminelli* decision in May 2023, numerous defendants have challenged Title 18 fraud indictments and convictions, and, with few exceptions, courts have consistently rejected attempts to expand *Ciminelli* beyond the specific facts and theory of fraud analyzed in that case. For example, in *United States v. Tuzman*, Nos. 21-2229 (L), 21-2379 (CON), 2024 WL 1173044 (2d Cir. Mar. 19, 2024), the Second Circuit sustained wire fraud convictions despite the fact that the jury had been instructed they could convict on either a traditional money or property theory or the right to control theory, because there was sufficient evidence in the record to show that the defendants' fraud scheme "involved knowingly inflating revenue and deceiving investors through false statements and information both to keep investors' money . . . and to obtain more money from investors." *Id.* at *2.   The Second Circuit added that the defendants' sending of false financial statements from their investment fund was "crucial to investors' decisions about whether

to keep their money at Maiden Capital and invest additional money," and that those false financial statements were sent to investors "precisely to deprive them of their money . . . and/or to obtain additional money." *Id*. at *2–3. *Tuzman* endorses precisely the theory presented in the present Indictment:   False financial information was provided to investors and the investing public by the defendants in order to deprive them of their money.   Furthermore, in *United States v. Porat*, 76 F.4th 213, 219 (3d Cir. 2023), the Third Circuit affirmed a wire fraud conviction in the wake of *Ciminelli*, where a business school's dean made misrepresentations to fraudulently inflate the school's rankings and thereby induce students to enroll and pay tuition, and where the defendant "'often' said that a Fox degree was like a 'stock' that was 'appreciating in value' as Fox's rankings rose."

District Courts around the country that have confronted the issue have also rejected efforts to expand *Ciminelli* beyond *Ciminelli*'s facts.   For example, a district court in the Western District of Texas recently denied a motion to vacate wire fraud convictions and rejected many of the same arguments made in the defendants' motion in an accounting fraud case that is very similar to the one presented by this Indictment.   *Baker v. United States*, No. 1:13-CR-346-DAE, 2023 WL 8234212, (W.D. Tex. Nov. 27, 2023).   The defendant in *Baker* was the Chief Executive Officer of a publicly traded medical-device company who, along with other senior executives, engaged in a "channel-stuffing" accounting fraud scheme that involved sending excess products to a distributor that did not need those products.   *Baker v. United States*, No. A-13-CR-346-1-LY, 2022 WL 21805928, at *1 (W.D. Tex. May 17, 2022), *report and recommendation adopted*, No. 1:13-CR-346-DAE, 2023 WL 8234212 (W.D. Tex. Nov. 27, 2023), *certificate of appealability denied*, No. 23-50898, 2024 WL 2880630 (5th Cir. May 31, 2024).   The defendant reported those shipments as legitimate sales, which inflated the company's revenue numbers in its financial reports.   *Id*.   Eventually, the fraud unraveled, and the company had to restate its earnings,

13

resulting in a significant drop of the value of the company's stock. *Id.* In rejecting the defendant's argument that his misstatements made to affect the stock price were the kind of economic information discussed in *Ciminelli*, the court noted:

> Here, Baker misrepresented ArthoCare's financial condition and business practices to deprive victim-investors of their money by inducing them, fraudulently, to invest in ArthroCare. The Government alleged Baker intended to deprive investors of money they would have otherwise had, not that Baker deprived the investors of potentially valuable economic information. Because the Government alleged Baker sought to obtain money from the victims, not that he only withheld valuable economic information, Ciminelli does not apply to or alter Baker's conviction. As previously discussed, ArthoCare's stock price 'could not be fraudulently inflated without continued investment by investor-victims.' The victim-investors' money was inherently an object of Baker's fraud—he could not continue to reap the financial benefits of increased stock price for ArthroCare without inducing victim-investors to buy stock to continue to increase the stock price. Wresting the victim-investor's money from them was not an incidental byproduct of the scheme. Baker did not merely withhold information. He actively put out false information to induce further investment and thereby part investors from their money.

*Baker*, 2023 WL 8234212, at *7.

Another example is *United States v. Tournant*, No. 22-CR-276-LTS, 2023 WL 8649893, at *1 (S.D.N.Y. Dec. 13, 2023), where the court rejected a motion to dismiss wire fraud charges in a case alleging an investment manager who understated the risks associated with certain investments and failed to disclose relevant risk information to investors. The court held that unlike *Ciminelli* and other right to control cases, "the Indictment here does not cast this risk-related information as the property of which victims were defrauded. Rather, the Indictment alleges that the scheme of which the alleged misrepresentations and omissions were part was designed to attract and retain actual investments of assets in the Funds." *Id.* at *9.

The district courts in *Baker* and *Tournant* are in line with other district courts that have refused to expand *Ciminelli* to cases that involve traditional property rights. *See United States v. Milton*, No. 21-CR-478-ER, 2023 WL 5609098, at *14 (S.D.N.Y. Aug. 30, 2023) (denying a motion for judgment of acquittal on a wire fraud count, finding that "an object of Milton's scheme

was to falsely inflate [the company]'s stock price and then sell his stock in [the company] to deprive investors of their money and obtain the profits for himself." The court explained that even though the scheme was stopped before the defendant was able to sell stock, that fact is "'wholly irrelevant,' because it is the contemplated object of the scheme that matters here."); *Jesenik*, 2023 WL 3455638, at *2 (denying mistrial motion during jury deliberations on wire fraud charges, noting "*Ciminelli* did not involve a victim parting with money based on material misrepresentations or half-truths made with an intent to defraud, which is a classic and well-recognized scheme to deprive a person of a traditional property interest, namely money").

The defendants cite to one outlier district court decision in their motion: A recent ruling out of the Southern District of Texas in which the court dismissed an indictment charging conspiracy to commit securities fraud and securities fraud under 18 U.S.C. §§ 1348 and 1349, in part based on an analysis of a right to control fraud theory. *See United States v. Constantinescu*, No. 4:22-CR-00612, 2024 WL 1221579, at *6 (S.D. Tex. Mar. 30, 2024). The Government believes this case was wrongly decided and notes that the United States filed its Notice of Appeal in this case on April 5, 2024. *Id.* (ECF No. 643).

*Constantinescu* involved a pump-and-dump scheme and conspiracy run on social media. *See id.* (ECF No. 134, Superseding Indictment at ¶¶ 1, 12–14). The scheme involved the defendants communicating in secret to purchase shares of a certain stock. *Id.* After the co-conspirators had established their positions, one or more of the defendants began to "pump" the stock by promoting it to their thousands of followers on social media through false and misleading statements about their position in the stock, intent to hold the stock, price targets for the stock, and other materially false or misleading information. *Id.* This promotion induced many of their followers to purchase the stock, thereby artificially inflating the stock's price and volume. *Id.* The defendants then secretly sold their positions in the stock at the inflated prices and at a profit,

which was often at the expense of their social-media followers who purchased and held the stock based on the false and misleading information disseminated by the defendants. *Id.* In its decision, the district court confused the object of that scheme—inducing their followers to part with their money and buy stock—with the means by which it was executed: lies about stocks and stock trading. *See Constantinescu*, 2024 WL 1221579, at *2, *appeal docketed*, No. 24-20143 (5th Cir. Apr. 5, 2024).

### 4. The Money or Property of Austal Limited's Shareholders and the Investing Public Was Not an Incidental Byproduct of the Defendants' Scheme to Defraud

In their motion, the defendants argue that any possible property loss implicated in the scheme "was incidental to the objective of the scheme."[2]  [Doc No. 129 at 23.]  This argument fails for several reasons.

First, as a threshold matter and as discussed repeatedly above, the Indictment explicitly alleges a fraud scheme to obtain money and property, and that language alone is sufficient under the Rule 7 pleading requirements.

Second, the false and misleading statements about Austal USA's financial condition and the performance of the LCS program were the means by which the defendants intended to obtain the object of the scheme: Depriving investors of money or property (i.e., causing investors to purchase Austal Limited stock that they otherwise would not have).  The goal of the defendants' fraud scheme was not to give people false and misleading information about Austal USA's financial performance; the goal was to maintain and increase Austal Limited's stock price by providing such false and misleading information.  Accordingly, the harm to the victims' property

---

[2] The defendants repeatedly and incorrectly state that the objective of the scheme was only to "mislead investors" ignoring that the defendants misled investors in order to "maintain and increase the share price of Austal Limited's stock" – something that could only happen if investors continued to purchase Austal Limited's stock.

in this case was not an incidental byproduct of the scheme because the scheme could not have succeeded without victim-investors parting with their property and buying or holding Austal Limited stock because of the defendants' false and misleading statements.

Third, the defendants' argument attempts to disassociate the goal of increasing and maintaining an artificially high stock price from the fact that such a price increase results from victim-investors buying and holding that stock at an artificially high price. A scheme to artificially inflate the stock price, as charged in the Indictment, necessarily relies on victim-investors purchasing shares of the stock at an inflated price. Here, increasing and maintaining an artificially high stock price was necessarily premised on investor demand to purchase the stock; and investor demand to purchase stock translates to investors' willingness to exchange their money or property for the company's stock.[3]

> ### B. The Indictment Sufficiently Alleges a Scheme to Defraud Austal Limited's Shareholders and the Investing Public

The defendants also argue that the Indictment does not adequately allege a scheme to defraud within the meaning of the wire fraud statute, but this is not true. Contrary to the defendants' assertions, the Indictment repeatedly alleges that the defendants engaged in a scheme to defraud. [Doc. No. 1 at ¶¶ 12 ("The Scheme to Defraud", "Overview of the Scheme to Defraud"), 14 ("Purpose of the Scheme to Defraud"), 15 ("Description of the Scheme to Defraud"), 34 ("While the purpose of the scheme was to defraud shareholders and the investing public . . ."), 40, 45, 51.] Under Rule 7, alleging the scheme to defraud is all that is required at this stage, and

---

[3] The defendants also note in their motion that the allegations related to Bank 1 and Bank 2 are irrelevant to the motion because they "do not set forth the scheme to defraud." [Doc. No. 129 at 24.] The Government does not agree that the allegations related to the banks do not set forth a scheme to defraud but agrees that the object of the scheme as alleged in the Indictment was not to obtain the money or property of the <u>banks</u>, but rather Austal Limited's shareholders and the investing public.

none of the cases cited by the defendants support their argument that the Indictment is not adequate.

But even if something more was required, the Indictment adequately alleges that the defendants engaged in a scheme to defraud with the intent to harm and obtain the money or property of Austal Limited's shareholders and the investing public for their own financial benefit.

## 1. The Indictment Properly Alleges a Scheme to Defraud and the Defendants' Intent to Defraud

The United States does not dispute that to prove the allegations at trial, it will have to present evidence that the defendants acted both with the intent to deceive *and* with the intent to harm and will be prepared to do so. The jury will be instructed that this is the Government's obligation. *See* Pattern Jury Instructions Eleventh Circuit: Wire Fraud 18 U.S.C. § 1343 ("To act with 'intent to defraud' means to act knowingly and with the specific intent to use false or fraudulent pretenses, representations, or promises to cause loss or injury. Proving intent to deceive alone, without the intent to cause loss or injury, is not sufficient to prove intent to defraud."). The cases cited by the defendants stand for this proposition, but do not suggest that an indictment must allege more than the statutory language, which is precisely what the Indictment does. This is so because, as the Eleventh Circuit held in *United States v. Bradley*, a "scheme to defraud" is "judicially defined" because the wire fraud statute does "not define what constitutes a scheme to defraud." 644 F.3d 1213, 1239–40 (11th Cir. 2011) (citing *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002)). Thus, in *United States v. Takhalov*, the Eleventh Circuit held that to intend to defraud, the defendant must also intend to harm the victim. 827 F.3d 1307, 1312–13 (11th Cir.), as revised (Oct. 3, 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016) (if "a defendant does not intend to harm the victim—'to obtain, by deceptive means, something to which [the defendant] is not entitled'—then he has not intended to defraud the victim." (quoting *Bradley*, 644 F. 3d at 1240)). Neither *Bradley* nor *Takhalov* hold

that an <u>indictment</u> must track the language of the Eleventh Circuit Pattern Jury Instructions or allege more than the statutory language. This should be the end of the inquiry at the motion to dismiss phase.

Notably, the defendants cite *United States v. Bobo*, a health care fraud case in which the Eleventh Circuit reversed the district court's denial of a motion to dismiss because the indictment did "not contain the remaining language of the statute which provides, in part, that the fraud must be 'in connection with the delivery of or payment for health care benefits, items, or services.'" 344 F.3d 1076, 1084 (11th Cir. 2003). (quoting 18 U.S.C. § 1347(1)). In contrast to the *Bobo* indictment, this Indictment tracks the statutory language and is explicit that the scheme was "to obtain money and property." [Doc. No 1, ¶¶ 40, 45, 51.]

### 2. The Defendants' Fraudulent Misrepresentations Went to the Heart of the Bargain: The Financial Performance of Austal Limited

The defendants also argue that the scheme alleged in the Indictment is not proper under the framework established by the Eleventh Circuit because it is not a scheme in which the defendants "lied about the nature of the bargain itself." [Doc. No. 129 at 27 (quoting *Takhalov*, 827 F.3d at 1313).] As an initial matter, the case cited by the defendants, *Takhalov*, was not decided on a motion to dismiss. But, more importantly, the facts of *Takhalov* are vastly different than what is alleged in this case.

In *Takhalov,* the defendants were convicted of wire fraud for a scheme to hire women "to pose as tourists, locate visiting businessmen, and lure them into the defendants' bars and nightclubs" while concealing the women's relationship with the clubs. *Id.* at 1310. The Eleventh Circuit reversed, noting that the men got the drinks they paid for once they arrived at the clubs, and thus they were not defrauded. The court explained that a scheme to defraud must entail intent to *harm* the victim (or else it is merely a "scheme to deceive"), concluding that "even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an

19

acquittal if the jury nevertheless believes that the alleged victims received exactly what they paid for." *Id.* at 1314 (internal quotation marks omitted).

The Eleventh Circuit recently clarified its holding in *Takhalov* in *United States v. Bell*, 112 F.4th 1318, 1327 (11th Cir. 2024). In *Bell*, the defendants owned a currency-exchange business that sold Iraqi dinar. The defendants were convicted of mail and wire fraud for promoting "misinformation" about the Iraqi dinar, encouraging "the spread of false revaluation rumors" and otherwise "len[ding] credibility to the idea that a revaluation was likely." *Id.* at 1328–1329. The Eleventh Circuit affirmed the convictions and rejected the argument that their convictions were foreclosed by *Takhalov* because the victim-investors received exactly what they paid for (*i.e.*, the dinar they expected at the price they expected). *Id.* at 1332. The court reasoned that the jury "could reasonably have found that [the defendants] deceived investors about a core attribute of the dinar: the odds of its appreciation." *Id.* at 1333.

Here, like in *Bell*, the Indictment alleges a scheme to defraud Austal Limited's shareholders and the investing public about a "core attribute" of the company whose shares they would purchase: the financial performance of the company. This is not a case where shareholders and the investing public got what they paid for—which is demonstrated by the fact that the share price (meaning the demand for the stock) was "significantly negatively impacted" when the true financial picture of the company was gradually revealed. [Doc. No. 1 at ¶¶ 31-32.]

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), also cited by the defendants for this proposition, has little in common to the facts of this case. In *Shellef*, the defendant was charged with wire fraud for lying to the victim about what he planned to do with the victim's product to induce the victim to *sell* his company more product. *Id.* at 109. The Second Circuit held that this theory of wire fraud was not legally sufficient because there was no allegation that "there was a 'discrepancy between benefits reasonably anticipated' and actual benefits received. *Id.* (quoting

*United States v. Starr,* 816 F.2d 94, 98 (2d Cir. 1987)).

Here, in contrast to *Shellef*, the defendants are alleged to have misled "Austal Limited's shareholders and the investing public about Austal USA's financial condition and the performance of the LCS program in order to . . . maintain and increase the share price of Austal Limited's stock." [Doc. No. 1 at ¶ 14.]   Shareholders purchased or held Austal Limited stock based on the financial performance of the company; thus, the false statements made by the defendants about the financial performance of the company went directly to the "benefit of the bargain."

### 3.  The Indictment Alleges a Convergent Theory of Wire Fraud:  The Defendants Intended for Purchasers of Austal Limited Stock to Be Both Deceived and Deprived of Their Money or Property

The Indictment alleges a convergent theory of wire fraud:  namely that Austal Limited investors were the parties intended to be deceived and the parties whose property was sought in the scheme to defraud.    But even assuming the Indictment did not allege a convergent theory of wire fraud (which it does), every circuit court that has considered the issue, except for one, has held that convergence is not required under the wire fraud statute.  *See United States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010) (holding "[i]t is irrelevant" whether defendants' misrepresentations were made "directly to the victims" and clarifying that "[t]he issue is whether the victims' property rights were affected by the misrepresentations"); *United States v. Greenberg*, 835 F.3d 295, 306 & n.16 (2d Cir. 2016) (holding "wire fraud does not require convergence between the parties intended to be deceived and those whose property is sought," and collecting cases); *United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013); *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998); *United States v. Blumeyer*, 114 F.3d 758, 768 (8th Cir. 1997); *but see United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (suggesting that a mail fraud defendant must intend "to obtain money or property from the one who is deceived.").

The defendants' argument overlooks the first stated purpose of the scheme, which was to

induce Austal Limited shareholders to part with their money, and instead focuses on the second listed purpose of the scheme:   to "unjustly enrich [the defendants] and others through the continued receipt of compensation, stock, and other benefits."   [Doc. No. 1 at ¶ 14.]   Here, misleading the Austal Limited shareholders and investing public in order to part with their money had a financial benefit for the defendants:   it allowed them to unjustly enrich themselves through compensation, stock, and other benefits.   The Government is not proceeding on a theory that it was the defendants' employer that was defrauded, and thus the defendants' argument about the lack of convergence is without merit.[4]

To the extent the defendants are suggesting that the Indictment must be dismissed because the defendants or Austal did not receive the money or property of the Austal Limited shareholders and investing public directly, this argument misstates the prevailing law.   There is no requirement that the defendants themselves obtained the money that victims paid to purchase Austal Limited stock at fraudulently inflated prices.  *See United States v. Baker*, 923 F.3d 390, 403—405 (5th Cir. 2019) (noting "no court has held that a 'mirror image' transaction is necessary" and holding jury instructions properly permitted conviction where defendant "intended to deceive the victims out of their money for his own financial benefit" by making false statements to induce their investments in a company, benefiting him indirectly "via bonuses and appreciation of his own stock options"); *see also United States v. Hedaithy*, 392 F.3d 580, 602 (3d Cir. 2004).[5]

---

[4] For the same reason, the defendants' arguments about the receipt of compensation and benefits not being property under the wire fraud statute are irrelevant [Doc. No. 129 at 20], as the unjust enrichment alleged in the Indictment is simply about the financial benefit the defendants received due to their scheme to defraud Austal Limited's shareholders and the investing public out of their money or property.

[5] The defendants close by suggesting that the deficiencies in the Indictment have been "recognized" by the Government because of the Government's decision to charge Austal USA in a related case with securities fraud and not wire fraud.   [Doc. 129 at 32.]   Contrary to the defendants' assertion, the Government's charging decision in the Austal USA case has nothing to do with the sufficiency of the Indictment in this matter.

## IV.    CONCLUSION

For all the reasons stated herein, this Court should deny the defendants' motion to dismiss the Indictment.

Respectfully submitted this 1st day of November 2024.


SEAN P. COSTELLO                          GLENN S. LEON
UNITED STATES ATTORNEY                    CHIEF, FRAUD SECTION


By: /s/ *Christopher J. Bodnar*           By: /s/ *Laura Connelly*
Christopher J. Bodnar                     Kyle C. Hankey, Assistant Chief
Assistant United States Attorney          Laura Connelly, Acting Assistant Chief
United States Attorney's Office for the    Robert Spencer Ryan, Trial Attorney
Southern District of Alabama              Criminal Division, Fraud Section
60 South Royal Street, Suite 600          1400 New York Avenue NW
Mobile, Alabama 36602                     Washington, D.C. 20005
                                          Telephone: (202) 514-2000
                                          Facsimile: (202) 514-0142